**UNITED STATES, Appellee,**

v.

**Andrew CORDOVA, Sergeant, U.S. Marine Corps, Appellant.**

No. 53,620, NMCM 85 0096.

U.S. Court of Military Appeals.

Sept. 21, 1987.

For appellant: *Lieutenant Commander Robert J. Smith, JAGC, USN* (argued); *Lieutenant J. Cunyon Gordon, JAGC, USN* (on brief).

For Appellee: *Lieutenant Georjan D. Overman, JAGC, USNR* (argued); *Commander Michael P. Green, JAGC, USN* and *Lieutenant Linda P. McIntyre, JAGC, USNR* (on brief); *Captain Carl H. Horst, JAGC, USN* and *Captain W. A. Kjos, JAGC, USN.*

PER CURIAM:

Contrary to his pleas, a general court-martial with officer and enlisted members convicted appellant of committing rape and forcible sodomy, in violation of Articles 120 and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 925, respectively. He was sentenced to be confined for 6 years, to forfeit all pay and allowances, to be reduced to the lowest enlisted grade, and to be discharged from the Marine Corps with a dishonorable discharge. The convening authority approved, and the Court of Military Review affirmed, these results.

We granted appellant's petition to review:

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY ADMITTING THE TESTIMONY OF CORPORAL JANET E. MALLEN.

The issue before us centers around the testimony of a prosecution witness, Corporal Janet E. Mallen, USMC. Corporal Mallen was assigned to the base Joint Public Affairs Office where she performed duties

in support of the base newspaper, The Scout. She was called to testify about a visit appellant made to the newspaper office approximately 1 week before the date of the crime of which he was convicted.

The challenged testimony from Corporal Mallen appears in the record as follows:

Q: All right; you can answer my question. What specifically was said concerning that article?

A: Specifically, he said that, "Isn't that something that happened to that woman?" And I said, "Well, it's not something that I would want to happen to me or anybody else." And he said, *"Well, it was pretty stupid of her to pull over and do that anyhow."* And I said, "Why?," you know, "I would do the same thing in a situation if I thought my car was broken because I wouldn't be able to go any farther, maybe something was wrong." And he said, *"Well, she was stupid for pulling over; it was a stupid thing and she's just a dumb bitch."* I said, "Hey, wait a minute now," you know, "if something like that was happening," you know, like I said, "I would do the same thing." And it came back from—in that point the conversation only lasted approximately two minutes, *but in that time span he was saying that the guys and him were joking about it and at one point he said that he thought she was a stupid bitch.* I said, "Hey," you know, "I don't think something like that is really nice; I wouldn't like it to happen to me; I had the same situation, something similar to that happen and"—

DC: We'd object to Corporal Mallen just rambling here. If the government has questions to ask she should just respond to the questions. We believe that's more appropriate.

MJ: Major Stevens, could you respond to that request.

TC: Yes, I would.

Q: Let me try to ask the questions instead of going on, okay?

A: [the witness gestured in the affirmative]

Q: Did he say anything about the identity of the person?

A: Yes, he did, as a matter of fact. He was saying in one part of the conversation that, *"How would she identify the attacker? It was supposed to be dark out there."* And I said at that point that I thought that if anybody had been attacked, including myself, I would always remember who had attacked me, and I'm sure she will for the rest of her life too.

Q: Did he say anything about the female in that incident asking to be raped?

ADC: Objection, leading.

MJ: Overruled.

Q: You can answer the question.

A: *He said that in her point, over in a dark alley or—excuse me, it wasn't an alley, that on a dark road like that she was asking for it.*

Q: Did he say anything about women preventing rape?

A: No. He didn't say anything about preventing anything.

Q: Did he say anything about the ability or the circumstances surrounding this individual being able to identify her assailant?

A: He did say that—

DC: —Objection, Your Honor. This had already been asked and answered.

MJ: Sustained.

DC: Thank you, sir.

Q: Okay. What, if any, questions did he ask about the composite drawing itself?

A: He did ask, *"How would she remember something like that? How would she remember in detail that he had a tan, or something like that; it was supposed to be dark. How could she remember all those details?"*

(Emphasis added.)

These statements concerned the rape of another woman one week prior to the charged offenses. Appellant did not admit to this rape, and trial counsel did not offer these statements as an admission. Instead, he generally offered these out-of-court statements as reflecting appellant's

"emotion, possibly motive, design, intent." Such a bald and unspecific proffer was discouraged in *United States v. Brannan*, 18 M.J. 181, 185 (C.M.A.1984), a decision published around the time of this trial. In any event, as a result of this proffer, we are unsure what particular state of mind these statements reflect and how such a state of mind is at issue in this case. Mil. R.Evid. 401, Manual for Courts-Martial, United States, 1969 (Revised edition).

■ At the very best, these statements reflect a gross insensitivity on the part of appellant to the plight of rape victims in certain circumstances. To find that these statements further reflect a desire on the part of appellant himself to rape or sodomize such women (motive) or hostility to such women (emotion) or a commitment on his part to rape such women (plan or design) is unreasonable. *See United States v. Watkins*, 21 M.J. 224, 227 (C.M.A.1986). Trial counsel's failure to articulate the rationale for these theories of admission leads us to conclude this evidence was irrelevant for these purposes. Mil.R.Evid. 401.

■ Moreover, the critical issue in this case was the identity of the person who attacked the victim. No real dispute existed as to the intent of the person who actually attacked her. Accordingly, the statements were ultimately being used to identify appellant as that person. Absent more particular explanation by counsel, we conclude that these statements accomplished this purpose by suggesting appellant was disposed to commit these offenses.* (*See generally* 1A Wigmore, *Evidence* § 54.1 (Tillers rev. 1983)). Such an evidentiary purpose is barred by Mil.R.Evid. 404(a). Thus, admission of this testimony was error.

■ Nevertheless, we hold this error was harmless in view of other evidence in this case. Admittedly, the victim could not positively identify her assailant because he had raised the hood of his sweatshirt and had a nylon stocking over his face. However, she did identify appellant as the man she just passed on the road to Las Pulgas gate. Moreover, she testified that her assailant "looked like" this man, wore the "same" clothes, and rode the same type red 10–speed bike. She also testified that her assailant wore a grey-hooded sweatshirt and tied her up with rope and nylon. Other witnesses placed appellant at the scene of the crime. Finally, the evidence shows that appellant was arrested near the scene of the crime, riding a red bike, with a grey-hooded sweatshirt and a rope in his knapsack.

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

EVERETT, Chief Judge (dissenting):

As explained in the per curiam opinion, the military judge erred by admitting the

---

* Trial counsel argued the relevance of this evidence to the members as follows:

> But keep in mind, he did go down to the Scout. It's a strange coincidence, he was down at the Scout office one week prior to being apprehended as the suspect in a rape case. It's a strange coincidence, he began a conversation with a stranger, this is, Corporal Mallen, concerning rape victims and rapes. The defense will say, "Well, the guys at the shop were talking about this article and we were all getting a little crass, or getting a little loose about it," and I'm not here to condemn the kind of conversations that go on in offices. I'm not here to get on my soap box about professional conduct. We know they were joking around and that's no problem. The attitude was, "Well, no big deal, no big deal."

And he's going to state that, "Well, Sergeant Cordova went down to the Scout to retrieve a birth announcement that was in the Scout earlier." But maybe we've got more than just a coincidence here, because he struck up that conversation about that rape. *Maybe what we've got here is the initial stages of his plan. Maybe something prompted his thinking about rape. Maybe something gave him a reason. Maybe he got the idea one week before he committed the offense. Maybe we've got a copycat. All we know is the fact he was downstairs discussing it—rapes, and one week later he is the suspect.* He was seen by Karen Driscoll riding his bicycle in the same area where she was attacked, fitting the description of her attacker. *Maybe—maybe he committed this attack and thought, "No big deal. The guys think it's a big joke back home."*
(Emphasis added.)

testimony of Corporal Mallen about a visit appellant made to the newspaper office approximately 1 week before the date of the rape and sodomy of which he was convicted. In my view, this error was prejudicial.

The case was contested, and the victim could not identify Cordova as the man who assaulted her. An observer, Richard Dejong, testified that appellant had been in the vicinity of the crime; but Dejong's wife, who had been with him, identified someone else. The rape occurred near the Mexican border; and so appellant's Latin appearance would not be very significant for identification purposes. Likewise, his short haircut which was used as an identifying feature would also be like that of many thousands of Marines at nearby Camp Pendleton.

The scientific evidence was inconclusive. For example, the victim was in her menstrual period; but there was no blood on any part of appellant's body. Scientific examination of the semen taken from the victim could neither exclude nor confirm appellant as the source. The doctor who examined Cordova did not recall seeing any scratches or cuts on his bare legs, even though the rapist had been wearing shorts and had dragged the victim into a nearby clearing in the brush. In this light, the tendency of the inadmissible evidence to prejudice the members against Cordova was at least arguable.

This was enhanced, however, by the argument* of trial counsel, who overtly invited the members to speculate as to appellant's guilt on the basis of an irrelevant event that had occurred about a week before the crimes for which Cordova was on trial. Absent this argument, I might have concluded that the court members, who undoubtedly were conscientious factfinders, would have recognized the irrelevance of Corporal Mallen's testimony. However, in view of the argument made for the Government, I cannot in fairness to Cordova indulge in such an assumption. Accordingly, I would set aside the findings of guilty and authorize a rehearing.

---

* The argument is quoted in the footnote to the per curiam opinion.